May it please the court. This is a case of where you have a single customer who was being gouged on pricing and decided to go to a second supplier to get tires. They went to a supplier they already worked with regularly and asked them to supply some sample tires. West, the defendant in this case, provided 12, excuse me, I'd like, my apology, I'd like to reserve seven minutes for rebuttal. West, the supplier in this case, provided 12 unbranded tires made by Super Hawk for Jeanne to do some testing. OTR's own expert determined, compared these unbranded tires to the outrigger tires and determined that these tires are not genuine outrigger tires. They have, they are structurally entirely different from the outrigger tire. This was a finding that was all... From a outrigger tire. Yes, Your Honor, from a outrigger tire. Not necessarily every outrigger tire. From the outrigger tires that were before the jury, from the outrigger tires that were provided... For the outrigger tire that was tested by, and I've now forgotten his name... Mr. Layden. The person whose, whose status as an expert or the nature of his testimony is at issue with regard to one of the evidentiary objections, but and he found them different. There were two people that tested the tires, Your Honor. One is Jerry Layden, who is OTR's expert witness, and he tested a, he actually asked OTR for a tire, an outrigger tire, to compare in an apples-to-apples comparison to the West development tire. Wet, OTR provided that tire to him and he made that test. His determination was that the tires were entirely structurally different. Every ply, every piece of material, every single part of the tires were in struck entirely different, with the exception of similarity in the design of the tread. So he made that determination from a tire that was provided. It's your choice to where you want to spend your time, but I'm not sure trying to persuade us that West never copied an outrigger tire. It's kind of a tough sell. Okay. Your Honor, to begin with, we, we believe that the evidence does show that, but the, the critical issue in this case. Well, the jury apparently didn't reach the same conclusion. They were, they were neglected the ability. You've got reasons why you think we should put that conclusion aside, but the jury didn't reach that conclusion based on the evidence they heard. That is true, Your Honor. So that's not the premise we start from. The critical issue in this case is false designation of origin. And in, under the Lanham Act, which is the false designation statute, the Lanham Act is designed to protect brands, not innovation. And it's critical to understand that OTR's position here is not that West ever took a genuine, already manufactured outrigger tire and disbranded that tire. At every turn from the, from the complaint, through trial, through closing argument, through post-trial, through this briefing, OTR has consistently maintained that what West did was utilize an outrigger mold to copy that tire. That is vastly different from using an already manufactured tire. I'm not sure I understand the difference. The difference is, the difference is what is explained under the Daystar case, under traffics, under Bonito boats, that if you have an unpatented, unprotected product of any nature, so here we have a tire that was not protected by patent or by trade dress, as the jury found. Once you have that, federal law permits and, in fact, encourages copying. Wholesale copying. But this wasn't just copying. The whole point of it, it's using the mold that was used for outrigger tires to produce another tire. That's not, that's not duplicating, that's not imitating, that's taking the tire that otherwise would be an outrigger tire and calling it West's tire. Your Honor, if, so long as there is no protection on that tire, that is permissible. That is what happened in Bonito boats, where they used unpatented molds for boat hulls, and the state law had said that that was impermissible, and the Supreme Court indicated that's not the case, that if it, because it's not patented, they could use that, those boats. The Sixth Circuit has also looked at this in the Kehoe Components v. Best Lighting. In that situation, you had a, the defendant actually was the manufacturer for the plaintiff, used molds to make tires for the plaintiff, used their specifications, and then turned around and made, used those same molds to make its own products. And the Sixth Circuit, looking at the Daystar case and traffics, indicated that that is not false designation of origin as a matter of law. And because the product is functional and it's unprotectable, it can be copied. There's just nothing that, that's the purview of patent law. You can get a utility patent on a functional design, you can get a design patent on an arbitrary design, and in both of those, what you have is a limited monopoly. Excuse me, can I, can you get me some water? What you have is a limited monopoly. Here, what OTR seeks to have is a perpetual monopoly on a functional product, a product that, thank you, a product the jury determined was functional and lacked secondary meaning. They have no rights in the, in the tire makeup. They had a trade secret case, they lost that case. They have no rights in the tire design. They had, they claimed trade dress rights, and the jury found that that trade dress was invalid as lacking secondary meaning and being functional. So what we have is a product that is in the crux of this case. If, if we had a different situation, if the trade dress claim had been upheld, we'd be, we'd be having a different discussion here. But the trade dress claim was invalidated, and OTR never sought to patent this product under design or, under design or utility patents. And what they're getting, essentially, if the, if this federal false designation claim persists, is what they have is a, a monopoly on a product that they wouldn't otherwise be, have any rights to in any other situation. Well, there are results well short of that. I mean, the, the objection here, as articulated, is that your client took their mold to make a demonstration or a set of demonstration tires. Now, I don't know why that should result as a remedy in what you're describing as a perpetual stranglehold on the market, because your client presumably is in a position to make its own tires at some point in time. But it doesn't remove the, the perceived problem that the jury found with a business practice that used the other guy's mold to make tires that you passed off as yours. So I'm saying I understand that, that the remedy which OTR most wants may not properly available, be available. That doesn't mean that no remedy should be available. Your Honor, we submit that it does. Because under Daystar, in Daystar you have a situation where the, the Supreme Court held that as long as, you know, again, the Lanham Act doesn't exist to reward manufacturers for innovation. It's, it is a, it is a brand designation issue. So once there is no brand on that tire, that cannot be in proper conduct under the Lanham Act. And that, I think, is very consistent with what is found in Trafix, what is found in Bonito Boats, and the Kehoe component case, component case looks at this very specifically. But OTR didn't win a judgment under the Lanham Act. They won other judgments. They did win another. Why, why is it impossible for the jury to conclude that this isn't appropriate for remedy under the Consumer Protection Act or under tortious interference, the other theories in which they found in favor of OTR? First Your Honor, just for clarification, they did win on the Lanham Act. That is the false designation of origin claim. That's true, they did win on that one. So they did win on that. And as the Court found at, at the record, the Court's position at the, in the post-trial motions at excerpt of record 39 to 40, is that precisely that because it is that precise finding that supported the false designation claim, which is what makes up the WCPA tortious interference and, the tortious interference in WCPA claims. So it is that, that precise situation and that finding of false designation of origin that creates those. And the Court said that's what supports them. Correspondingly, if there is no false designation of origin, we submit there cannot be, cannot be any WCPA or tortious interference claims. So for that reason alone, we believe that that is the case. Additionally, Your Honors, the WCPA requires that there be a harm to the public, again, had they won the trade dress claim. Did you make a Rule 50 motion on that basis? Your Honor, we did. That is reflected at excerpt of record 401. We indicated as we're indicating here that it rises and falls with the Lanham Act claims because the WCPA specifically requires that there be improper conduct that affects the public interest. The Court repeatedly recognized that these claims are connected. These are derivative, the state law claims are derivative of the Lanham Act claims. Once OTR, I mean, once the jury found that OTR had no trade dress rights in this tire, there is nothing left for the WCPA. That's a different argument that I thought I just heard you make, which was the public interest element. Let me clarify. The public interest element of the WCPA, it is, is found automatically if there was a violation of the trade dress infringement because trade dress infringement is a consumer protection type claim. The Lanham Act is designed to protect consumers. Once again, that statutory basis goes away, then there is nothing left that would support this claim. There is nothing that affects the public in any way because that was their link to the public claim. I'm aware you made the argument to the District Court in your Rule 50 motion that the Lanham Act claim can't survive and the rest can't either. I didn't see anything that articulated what you just told me, which is that there is no other possible source of public interest. Why isn't there another possible source of public interest? Because in the situation where you have tortious interference claims that are a single one and the tortious interference claim, even if it were to survive with respect to Solid Deal SuperHawk, only affects OTR, that is not a public interest. The other is relating to these 12 unbranded tires that were given exclusively to a single consumer. I believe it is the Hangman Ridge case out of Washington at 719 P. 2nd, 531, references what can create public interest. When you have a single transaction like this, this giving over of the unbranded tires to Jeanne, it must affect many consumers. Was any of that argument made to the District Court? It was made to the District Court in the notion of the rising and falling. In fact, as an argument, the District Court basically pushed us to finish our 50A motion. It is a fat record. I didn't read it all. I did search for public interest and I didn't find it. I am sure I did not use that terminology, public interest. I said it rises and falls. The Lanham Act claim is what establishes the public interest. It is what OTR has premised its case on. This violation, this counterfeiting, which they claimed West counterfeited these tires, that counterfeiting of those tires is what premised how the public was injured. If there is no Lanham Act, there is nothing that impacts the injury. There is no injury to the public in any respect. You have repeated that. I am trying to find where. Is this in the transcript as an oral motion? It is. SER 160. Is that where you want me to be looking? I want you at EOR 401, where we indicated that the WCPA claim rose and fell with the Lanham Act claim. Thank you. As I indicated, there is no impact on the consumers in any respect other than with the tortious interference claims. Again, we believe, as the Court did in Excerpt of Record 39-40, that claim is also tied to the Lanham Act claims, that that also rises and falls. These are exceptional emails. I have never seen emails like this. They are very problematic for you. It is hard for me to imagine that they are using a tortious interference claim. I am just flipping through trying to find them. It is a large record. Forgive me. I think I read one where there were these multiple requests from Mr. West, and they were rebuffed a couple of times and said, we can't do this now. We have an agreement with a third party. I think with OTR, with OTR's affiliated entity. Why isn't that a tortious interference claim? Because it is not a tortious interference for OTR. That is why it is not a tortious interference and which is why we objected to the jury instructions. That is an argument. That has nothing to do with the rise and fall on the Lanham Act. To my other point, Your Honor, we objected to the jury instructions and we objected to the evidence of those contracts coming in at all. If you don't win on those other objections, which you are not going to have time to speak to. Both of them are controlled by abuse of discretion. But anyway, to Judge Clifton's point. Your Honor, if we don't win on those, if we don't win on those, even as the court found it, except a record 39 to 40, the court's position is I don't see that. I am looking at 39. I am not sure. At the bottom of 39 to 40, the court indicates that the tortious interference, I mean the false designation is what supports, he starts with the substantial evidence relating to the tortious interference with Jeanne, Super Hawk and the WCPA. Forgive me, I am flipping through again and I will certainly double check, but the only place I remember seeing that discussion had to do with the court's reasoning regarding pre-judgment interest. I will look back again, Your Honor, in a moment, I will reflect that. Counsel, you are eating into your rebuttal time. It's a bear of a case. We understand the problem. So I will, Your Honor, we also submit that the fraud claim was amply supported based on the jury's ability to evaluate the testimony of OTR's witnesses back to the facts relating to functionality. Here you have the President. How does it matter at this point? I confess there are too many moving parts, so I haven't got a complete handle on it, but unless something else changes, why does the fraud determination matter at this point? It goes to the equities of the case. It goes to the potential of attorney's fees. Fraud can provide a defendant damages as well in a case, so it goes to other bases. Your Honor, I will reserve the rest if I could, thank you. Good morning, Your Honors. My name is Joel Bertocchi. I represent the OTR group of defendants and I would like to reserve five minutes for my cross-appeal rebuttal. Was that the fraud issue? Sorry? That is whether we should get a new trial or judgment as a matter of law on our infringement claim. That's what's in the cross-appeal. Right, but that wasn't discussed by... Anyway, go ahead. No, but she will discuss it when she gets back. Okay, she will discuss it when she gets back. I get it. If I discuss it. And if she discusses it... Which I will. If she discusses it when she gets back, then you want a rebuttal for that. Judge Kristen, let me help you flip through the giant record. Take a look at page 301 of the exits. My law clerk is going to be so upset with me. I had these all tabbed. Okay, go ahead. It's what, 301? You start with page 301 of West's excerpts of record. I've been doing appeals for 30 years and rarely have I ever found an appeal where my whole case, even though there's lots of other evidence and I'm not giving it up, is pretty much summarized in terms of the verdicts of OTR 1 on page 301 of the excerpts of record. Okay, hang on. Hang on, hang on. Sorry. What is 301? So I know what I'm looking for. The real one is the problematic emails of April of 2012. Right, okay. Where... Exactly what my law clerk tabbed for me. Hang on. And I spent last night on... Oh, okay. It's usually good help, but finding good judges is a little tricky. It's tough to find good judges. And he had it all... I'm sure he's listening. Okay, I'm on it. Judges and iPads. Start at the bottom because you read emails upside down. You have Mr. West essentially asking, don't you make this size for Solid Deal? Could you buff off the Solid Deal name or remove the plate and let me get it tested? He understands what he's doing. He's explaining what he's doing. Volume is very high. He's dangling business. We can make a lot of money if you do this. Counsel, this has been the focus that... I promise. We have read these emails. Okay. And they are... And I won't go through it. I'll just direct you to page 301. Something else, and I don't want to spend a lot of time on the verdicts that we won either. But Ms. LeBron-Dykeman's explanation of what we won in reverse passing off leaves something out. What was removed, and it's also mentioned in those emails, it's not just using OTR's mold and bladder to make the tire. It's putting spring plates on to cover up the words outrigger. Or at least there was evidence from which the jury could have found that. Right. Outrigger is trademarked, not disputed. So they took the name off the tire. She keeps talking about them as unbranded. They unbranded them. They made them, but they unbranded them. But that means they're not infringing on the name. And so we go back to the question of is there something more to be protected in the face of the jury's determination, apparently, that there isn't as a matter of Lanham Act protection. But remember, there's two different trademarks here that we're talking about. The reverse passing off has more to do with the trademark on the name that was taken off the tire. It's not that the design of the tire wasn't infringed also. Well, I don't understand that, because as a genie, didn't get demonstration tires that are labeled outrigger. Indeed, they got tires which by their evaluation were very different from an outrigger tire, which has me completely confused, but that's not the only thing that confuses me in this case. Well, that's my next point, Your Honor. Let me get to that. They got outrigger tires that somebody had taken the name off, and the name was trademarked. There's two trademarks here. There's the trademark on the outrigger name, which has never been disputed, and there is But wasn't infringed. It was, because it was removed. Well, it wasn't infringed, but it was Or was never actually on the tire in the first place because of the use of the spring plate that apparently covers up the mold. It was on the mold, and that's reverse passing off. They essentially created But not infringement. They created But it's not infringement. No, not on that trademark. No, not on the name. But it is reverse passing off, because they made an outrigger If we take out the name plate and all the sidewall information, nobody will know. Right. That's reverse passing off in an email. If he had used the word, we can reverse pass this off. But what's being passed off? What's being passed off? It's not the outrigger name and information. No, it's an outrigger tire. It's the tire, which brings us to the question of what protection is there for the tire and the tread, which is apparently what we're really talking about here. That doesn't come into play until you get to the infringement claims. But that doesn't have to be implicated in the reverse passing off claim. The reverse passing off claim, the protection is the outrigger name that they took off. This is textbook reverse passing off. The protection, I got to tell you, I just don't understand the protection to the outrigger name when they took off. West never pawned this off as being an outrigger tire. And Jeanne wouldn't have known that it was an outrigger tire. That's not what reverse passing off is. That's what passing off is, is saying this is an outrigger tire when I made it in my basement. Reverse passing off is taking somebody else's product and passing it off as your own. And that gets you to her argument that the two experts looked at these tires and did the cross section and said these were not. And that's my next point. And let me explain that. There are two experts at issue here. One testified and one didn't. One was a gentleman named Cape who worked for Jeanne who wrote a report that Judge Succo excluded. The other one was Mr. Layden who was OTR's expert who testified. They did similar testing on different tires and they cut them open. And Mr. Layden explained, and this is what clarifies it, that the internals of a tire, the way the plies lay up on each other, will be different on the same tire if it's made in a different plant. But that doesn't mean it's not the same product. The difference between, and you mentioned this as an evidentiary issue, the difference between the Jeanne report that West tried to get in and Mr. Layden's testimony is that Mr. Layden showed up in court. He got qualified as an expert and he got cross examined. Whereas Jeanne, West tried to do the same thing with this Jeanne report without calling Mr. Cape. So they just wanted to put the expert report in and let it go at that. But that's the difference. Yes, tires from different plants, outriggers from different plants will be different on the inside. The specifications will say it has to have a certain number of plies and they have to be made of a certain material. Maybe they're nylon, maybe they're metal. But they aren't going to come out exactly the same way in the Sri Lanka plant as the Thailand plant if you cut them open. And Mr. Layden explains that completely. I want to go on to my cross appeal at this point. I should spend a moment, because Ms. LeBron-Dykeman did at the end, talking about the judgment of the matter of law that they've appealed, that Judge Succo granted on the fraud claim. And I think, honestly, I don't need to say much more than what Judge Succo did. He did a very thorough analysis of the record. We wish that he had been able to reach this ruling before the case was brought before the court. But afterwards, and I think he pointed out very effectively, that there really was no evidence of fraud here. Because the disclosures had been made to the patent office. Everything was. West seizes on two supposed misrepresentations. An email from Mr. Evans that was different than his declaration. Well, that's not surprising. People write different documents for different reasons. But everything that is in the paragraph they say was left out was said seven months earlier in a declaration from Mr. Smith in greater detail than an email. So the examiner got more than that. The same is true of Mr. Smith's own discussion about people can see the difference in these tires. And let me tell you, I mean, I've looked at a lot more pictures of this than you have probably. And I've looked at a lot more of these tires. I have a chunk of one in my office, which is very helpful. You will be able to recognize these eventually. They are quite distinctive. And they're especially distinctive. Rated cocktail parties, I'm sure. I was going to bring it here with me, but they wouldn't let me bring it on the plane. Why does the fraud piece matter? Because it matters to OTR's registration, registered trademark in the angles of the lugs, which they lost as a result of the fraud. Well, we're getting to that issue. Yes. But is the registration, would the registration be reactivated if the fraud piece were set, if we simply affirmed these pieces of the district court? That is, let the fraud piece be taken out, but retain the jury's finding with regard to. The tortious interference. Well, with the validity of the registration in the first place. Isn't that the piece? No, the, what's the, too many pieces here. I hear, I feel your pain. The jury's answer to special verdict question number one. Yes. If that survives, would registration be in the cards again? Don't you have to set that aside? Well, I think what we've argued is that the jury's question, answer to question number one, that it was not valid. You're going to be getting to that, but I'm trying to figure out which piece has what impact. And I understand that the setting aside the fraud is important to the argument you're going to make there. Right. I'm trying to figure out, does the setting aside the fraud have other significance beyond that? Not really, except to revive the trademark, essentially, or at least get us a new trial on whether the trademark is valid. Now I want to take a moment and get my play. We were talking about fraud and the other aspect of fraud. Just on your last point, your argument about your entitlement to a new trial, given the setting aside the fraud verdict, is that that somehow tainted the... Well, there are three reasons, and that's one of them. A fraud is... I didn't find this part persuasive. You want to take your best shot on this? Well, if I understand the question, fraud is the most, there are three reasons... No, my question, I don't want to leave you wondering. My question has to do with why you think you're entitled to a new trial. Well, we think we're entitled to judgment, as a matter of law, on that our trademark was valid. But if the court believes that functionality and lack of secondary meaning are contestable, then we should at least get a new trial on it, and there are three reasons for that. One is that you cannot say with confidence, given the way those two questions on the verdict form were worded, that the jury ever considered functionality and secondary meaning. I assume that they followed the instruction. But that's the problem with that verdict form, is there an inconsistency between the way the instructions told them what to do and the way those questions were answered. Whose fault is that? I mean, did anybody object to the form? It's West's defenses, Your Honor. It's their responsibility. Well, I mean, but everybody had a chance to weigh in on it. I mean, I've been in trials where it turns out the jury comes back and says, there's a problem with this form. Oh, gee, thanks, jury, for doing the extra work, because we'd missed that on number 42 and 43 and so forth. But I'm not sure how the fact that the jury answers a questionnaire which, on its face, tells them answer, seems to say answer one, and that tells you whether you go on to answer number two, and then over here I have instructions that say, you really ought to start with two, and that determines whether you should answer number one. And nobody's objecting to either the instructions or form on that respect. Why a do-over? Because West, well, on this issue, because West is the one that has to be able to say, as the cases say, that the jury actually considered those issues. No, don't think so. We had a jury verdict. You have to try to overturn the jury verdict on question number one. Well, okay, we have to persuade you, but West got the verdict. But that's done. That counts for something. Counsel, did you object to the special verdict form? I'm not aware that we did, Your Honor. I mean, I understand how it happens, but it happened. And we can't finger anybody as being responsible. You want us to assume the jury got it wrong. No, we don't want you to assume anything. We want you to recognize the fact that the jury may not have considered functionality or lack of secondary meaning at all. What you just said, I think, tells me that the answer to my question is yes. The jury may not have. You want us to assume they got it wrong. No, I think that if they may not have, then we cannot say with confidence that they did not decide this case solely on grounds that Judge Succo later took away from them. I asked you a minute ago why you think you're entitled to a new trial, and you think you had three reasons? I did. Okay, so what about the second reason? The second reason has to do with the nature of fraud as a claim. If the fraud claim didn't belong there. Fraud is, in my view, the most inflammatory accusation you can make against anyone in a business case. Okay, but as to that one, this is the one that I talked about. Forgive me for interrupting, but I'm trying to help with the time. So this is the one that I call sort of the washover. You're concerned that this tainted. But that doesn't mean that the evidence was inadmissible. It means that the court allowed them to take their best shot on their fraud claim, and the jury found it. You know, they came up empty, but ultimately the judge decided that. But it doesn't mean the evidence was inadmissible. Well, I think it would have affected a lot of evidence. But if you look at the trial record, the fraud claim that the judge later decided shouldn't have been in the first place dominated the trial. Where's the error? Where's the court's error? The error is in allowing West to make arguments and introduce evidence about fraud and stand there and say fraud, fraud, fraud. Because there was a motion that should have excluded it? Well, if the judge had reached the conclusion that he reached after trial, before trial. Well, why was he supposed to do that? He's not prescient. He was asked to. He was asked to. And counsel, this is like policy. Because there is, okay, I'm sorry. What's the motion you are, what's the ruling you're appealing? That's what I'm trying to get at. Where's the error? The ruling we are appealing is the failure of the judge, having granted a judgment as a matter of law on fraud, to then say as a result of that, we should grant, I should grant a new trial without the fraud claims, or judgment to OTR on the infringement claims. Okay, so we're not communicating. Okay. I'm trying to figure, forgive me, but I'm trying to figure out what the error is that you're complaining about regarding first the verdict form. We got past that. You didn't object to the verdict form. Yes. And now I'm talking about as to the fraud evidence, I'm trying to figure out whether you think the judge erred in allowing that evidence. Yes. So it's abuse of discretion standard? He abuses discretion by allowing them to introduce evidence of fraud on the patent office? Ultimately, since they didn't make their fraud claim, yes. Okay, what's your third reason you should get a new trial? The third reason is that there was, in fact, insufficient and really no evidence of either functionality or lack of secondary meaning, which were the only grounds left if fraud is out. Well, there was some evidence of functionality. If nothing else, there's the email that fell short of fraud, but there's the email suggesting that the treads were self-cleaning, the design of the treads were self-cleaning. Why is there no evidence? You've got the treads. If you remember nothing else I say today, please remember this. What was trademarked was not the tread. It was not the lug. It was not the interlocking lugs. It was one specific feature of the lug. It was the steep angle of the lug. How does that help me? I've read that a lot of times in your book. I know. Why does that help me when we go to functionality? Because nowhere in the record does anybody say that the steep angle of those lugs helps self-cleaning and tract and force, which is the same thing. Okay. I appreciate the clarification. And now I've used up a bunch of your time about why you think you need a new trial, but I understand your answer. Do you want to go on with the rest of your argument? Well, Your Honor, I was going to go on to that part of the cross-appeal and talk about the fact that there was no evidence of functionality in the trademark sense. And the Court's got to apply the disc golf factors, but it's got to apply them with an eye toward the Supreme Court's repeated admonition that function has to be essential. Mr. Layden testified without dispute that sharp angles like that are counter-functional. They are the worst way to do, to make a tire that's got better traction and self-cleaning. And your argument was that there's no evidence to the contrary? There is no evidence to the contrary about the lug angles. There's lots of people who talk about the treads help, the interlocking lugs help. Those are all features of all R4 tires. But what Mr. Taylor did is he looked at one feature of that and decided to do it this way so it would be distinctive, because a customer asked him to, which is classic what you would want to trademark. But in doing so, he sacrificed a little bit of function, and he made it counter-functional. If it's counter-functional, it's not functional. If it's not functional, you can trademark it if it's also distinctive. Thank you for the clarification. I didn't mean to ruin your morning by asking the question. Oh, no, no. Sorry. No, I think that was the highlight. What do you think they've done to our morning? No, no, no. This is our job. It's all fine. It is, absolutely. And there's also no evidence that there was not acquired distinctiveness. Five OTR witnesses testified about that, and they all talked about it. There is no suggestion that it hadn't acquired distinctiveness in 12, at that time, 14 years of use, $48 million in sales of that tire. What about the continuing injunction? The injunction is not before you, as we've said in our brief, and we all agreed on that down below because we went to Judge Succo with a Rule 54 motion that Wes joined, saying, please let us appeal the rest of the case, and that's why we're here, because he granted that motion. The injunction is sitting out there. I think it's amply supported by the verdicts that we won. Certainly, it will become more supportive if we can get our new trial or our judgment on the infringement claims. Why is it supported by the verdict you won? Years have passed. There's been lots of time when Wes could have developed its own tire. If he develops his own tire, that won't violate the injunction. The injunction doesn't say he can't sell tires by any means. It says he can't sell OTR tires or copies of OTR tires. And it was narrowed by this Court when the injunction first came up. It says directly or indirectly making commercial use of OTR's registered trade dress. Right. Directly or indirectly using OTR's outrigger trade dress. Right. Directly or indirectly manufacturing, producing, et cetera, OTR's outrigger models. Right. If he wants to make his own tire, the injunction's got nothing to do with that. He's welcome to, and I don't know, maybe he has. I don't even know. I guess I'll reserve what's left of my time for rebuttal on the cross-appeal. Thank you. All right. Thank you, counsel. May it please the Court. First, with respect to your question before, at Excerpt of Record 39, under paragraph or Section 2, tortious interference in CPA is where the Court references the interlink between the claims, all being connected to the false designation claim. Thank you. Additionally, with respect to the false designation, which we believe is the key to our appeal here, we believe it is semantic trickery to say that the outrigger is a genuine, or that the West tire is a genuine outrigger, because it does not, it is not made up at all the same. Could the jury have so found, because of the testimony, I was concerned about the testimony about the tires being manufactured at different plants, could the jury have so found? We don't believe so, Your Honor, because Mr. Layden's the one who tells them that this is, these tires are entirely different. But he also told them it would be if they were purchased. But that's pure speculation, that it could be made in a different way. They had a trade secret claim saying, we have specifications. All our manufacturers must use these specifications. Did you offer any evidence of an alternative source of the tire? We did not. So those emails yell out kind of loud that it's likely those tires came from the outrigger mold. But OTR doesn't, first of all, OTR doesn't make or get any tires from Super Hawk. A separate set of arguments. But from the mold of OTR's partner. Your Honor, even if the jury believed that West used that mold, that doesn't create false designation. It simply doesn't. But now you're getting to a different issue. And I'm not denying that issue. But you're trying to make a case that said that their experts said they're entirely different tires. End of story. And that's not the end of the story. We believe, Your Honor, if, assume the jury's facts are, as the jury presumably found, that they used the mold. That doesn't create false designation. We believe as well, the fact that it's not a genuine outrigger. But for false designation, it doesn't matter. Because it is not, it was, even if we made it in the same mold, because they have no protectable rights on the functional tire or its tread, and no use of outrigger were made, it is not reverse passing off or passing off. So it is not a Lanham Act violation. And you're relying on Daystar? We're relying on Daystar. It's progeny. And I do want to reiterate the Kehoe case, which I think is very specific, 796 Fed 3rd 576, which is in our briefing. With respect to their claim that the fraud verdict somehow taints the entire verdict. Number one, to your point, Your Honor, they never requested that the fraud verdict, they never be excluded, or the fraud evidence be excluded. They didn't file a motion in limine. They didn't file a motion for summary judgment. They didn't even object to most of the evidence. So they have no basis for claiming it shouldn't have gone to the jury. Number two, the, it is not West's burden to prove that their trade dress had, was invalid by lack of, by lack of secondary meaning or functionality. It is their burden to prove that they are the trademark owner. They had the burden to prove functionality, or non-functionality and secondary meaning. And with respect. Play in a little bit to his argument about the order of the verdict form, since the burden would shift depending on the fraud finding. But, but I digress. Okay. Go ahead. With respect to fraud, there's ample evidence. You don't have to look past the Taylor email. Taylor, who is Fred B. Taylor, FBT, the registrant, before the issue, Mark was registered, tells his business associates the range of the tread angles, angles, the range of the tread angles and the tire's flatness are the key to the why, why the tire works so well. But don't you have to show reliance? That's, that's to the fraud issue, Your Honor. That's what I'm talking about. But I'm saying with respect to the functionality, the fact that there is functionality at all. But respect to the fraud issue. Okay. What about respect to fraud? It sounds like Judge Wallinson and I had the same question, which is that lack of showing of reliance by the patent office. The reliance is, Your Honor, OTR knew all of these facts. They gave, they had a. There has to be reliance on the part of the PTO. That's, well, it's my concern. Okay. Your Honor, with respect to the Smith declaration, it was immediately after that declaration that the court, the trademark office lifted the objection for secondary meaning and they maintained the objection for functionality twice until the Evans declaration was submitted. So we believe that, that reliance is there. But even if this court doesn't agree with this on the fraud issue, it doesn't entitle OTR to a new trial on functionality, on the validity of the trade dress at issue. And because of that, because there's plenty of evidence of lack of secondary meaning with respect to, there are, secondary meaning requires consumer perception, consumer understanding and association of the mark with the brand owner. Here, the only evidence that OTR offers is its own employees and experts. No customers testified and any testimony they have even with respect to the distinctiveness of the tire that they say that angle, understand we're talking a five degree angle difference between the Beefy Baby and the Outrigger, five degrees. With respect to that, that evidence is all contradicted by the fact that their own employees can't tell it apart from the Beefy Baby, which preexisted them and was being sold at the same time. Your Honor, I see my time is up. Yes, you've exceeded your time. Thank you, counsel. I needed the help. Final rebuttal. Thank you, Your Honor. The jury was entitled, it sounded to me as if Ms. LeBron-Dykeman was arguing that there wasn't any evidence that West, that West, that that tire was made at Superhawk. But there was plenty of evidence of that, including the fact that Mr. Zhang said he'd make it. And the jury was entitled to believe that he did in the email, that he did what he said he would do in the email. The error, and this goes back to some of Judge Kristen's earlier questions to me, the error on the judgment as a matter of law was that it wasn't granted before the case went to the jury. But that happens. District judges are sometimes urged to wait. Right. And when it happens, there are results. And the result in this case was that it allowed the jury to consider. Well, the result is rarely that the jury's verdict on the counts that did go to the jury gets set aside and we get a new trial. Well, it depends on the nature of the allegation, because not granting that motion before trial changed the character of the closing arguments and it changed the character of the jury instructions. Fraud is not just another count. They didn't. I'm sorry. Go ahead. Okay. You have precious few seconds. Go right ahead. I do, Your Honor. Ms. LeBron-Dykeman mentioned the Taylor email, which was also mentioned in the letter she sent the other day. But she misquoted it in her letter. And she misquoted it today. Mr. Taylor did not say, and it's at ER 348. That was my next question. I could feel it. You've heard us. It's at ER 348. And the way she quotes it in her letter and the way she quotes it today is she says, Mr. Taylor said, the key to why the tire works so well for AWP vehicles. The word works is not actually in that sentence. The word that's in that sentence is performs. Now, why is that different? I see the furrowed brow and I will tell you. This is not an email to customers in which Mr. Taylor is bragging about how well his tire handles mud. This is an email to business partners in which he is telling them, hey, we're going to get trademark protection and no one else is going to be able to sell this. Performs refers to sales. He is talking, and again, he's not talking about that particular angle, which is all that is trademark. Well, it might refer to sales. Well, okay, it might. But by the way, this is one piece of evidence in an overall very large record where people testified over and over, sure, lugs contribute to functionality. Sure, interlocking lugs contribute to functionality. But this angle doesn't contribute to functionality. It cuts against functionality. So it's not functional. It was distinctive through years of use, and it was eligible to be trademarked, and that's why he did it. Thank you, Your Honors. I appreciate your attention. Thank you, counsel. Thank you to both counsel for your helpful arguments in this case. The case is submitted for decision by the court that completes our calendar for today. We are on recess until 9 a.m. tomorrow morning.
judges: Rawlinson, Clifton, Christen